IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Case No. 3:24CR50 (RCY) |
| | ) | |
| TRE'QUAN C. DILLARD, | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION**

This matter is before the Court on Defendant Tre'quan C. Dillard's ("Mr. Dillard") Motion to Suppress Physical Evidence ("Motion to Suppress" or "Motion"), ECF No. 20. On March 19, 2024, Mr. Dillard was charged in a one-count Indictment with Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1). Sealed Indictment, ECF No. 3. On April 29, 2024, Mr. Dillard filed the instant Motion, seeking to suppress all evidence related to the recovery of a firearm on Mr. Dillard's person following a traffic stop. The Motion has been fully briefed, *see* ECF Nos. 20, 22, 24, and on June 24, 2024, the Court conducted a hearing on the Motion to Suppress. At the conclusion of the hearing, the Court denied the Motion from the bench. This Memorandum Opinion sets forth the Court's reasoning.

**I. LEGAL STANDARD**

On a motion to suppress, "the burden of proof is on the defendant who seeks to suppress the evidence." *United States v. Seerden*, 264 F. Supp. 3d 703, 708 (E.D. Va. 2017) (citing *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981)). Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove, by a preponderance of the evidence, that the challenged evidence is admissible. *Id.*; *United States v. Bello-Murillo*, 62 F.

1

Supp. 3d 488, 492 (E.D. Va. 2014) (citing *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974)).

In ruling on a motion to suppress, a district court "may make findings of fact, as well as rulings of law." *Seerden*, 264 F. Supp. 3d at 708 (citing *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005)). "At a hearing on a motion to suppress, the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *Id.* (quoting *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir. 1993)). Excepting rules on privileges, the Federal Rules of Evidence do not apply at suppression hearings. *United States v. Smart*, 91 F.4th 214, 224 n.7 (4th Cir. 2024), *cert. denied*, No. 23-7492, 2024 WL 3014590 (U.S. June 17, 2024).

## II. FACTUAL BACKGROUND

The facts are based on testimony given at the suppression hearing. They are augmented by video and audio of the traffic stop recorded by the arresting officer's body worn camera.

On January 16, 2024, Richmond Police Department ("RPD") Officers Barnes and Gibson were on patrol together in a marked police vehicle in Sector 113 of the RPD's First Precinct, near the Church Hill North neighborhood, which the officers testified is a high-crime area. Both officers were in uniform with their badges displayed. The officers were in their vehicle on Venable Street, near where Venable Street intersects with North 25th Street.

Shortly before 9:30 p.m., the officers observed a black Ford sedan traveling southbound on North 25th Street. The black Ford had driven down Venable Street, stopped at the intersection, and then turned right onto North 25th Street. As the Ford traveled down North 25th Street, Officer Barnes observed that the Ford had no front license plate displayed. The officers turned onto North 25th Street behind the Ford. As they made their turn, the officers activated their emergency lights

and siren to initiate a traffic stop.  The Ford pulled over to the curb on North 25th Street.  Prior to approaching the driver of the vehicle, the officers observed that the Ford's temporary tag was expired.

Driving the Ford was Mr. Dillard, a 22 year-old Black male.  In the passenger's seat was a woman, C.W., who is around Mr. Dillard's age and also Black.

At 9:30 p.m., the officers parked their police vehicle behind the Ford, then got out and approached on foot.  Officer Barnes approached on the driver side, where Mr. Dillard was seated.  Officer Gibson approached on the passenger side, where C.W. was seated.

At 9:30:35 a.m., Officer Barnes greeted Mr. Dillard and C.W. and introduced himself as a police officer with the RPD.  Officer Barnes explained to Mr. Dillard and C.W.:  "I pulled you -- your tags are expired."  Officer Barnes did not mention the missing front plate; he testified that there are often multiple reasons to pull a car over, though he may only state just one reason when explaining the stop.  Officer Barnes asked Mr. Dillard for his ID.  When he learned the Ford was C.W.'s car, Officer Barnes asked C.W. to provide her ID to Officer Gibson.  Mr. Dillard stated that he did not have his ID on him.  Officer Barnes then asked:  "Any weapons in the car?  Not illegal, we just need to know whether you got a gun."  Mr. Dillard shook his head, indicating, "No."  As Mr. Dillard shook his head, he moved his eyes away from Officer Barnes and looked forward.  Officer Barnes then began gathering Mr. Dillard's personal information.  Mr. Dillard, now looking back at Officer Barnes, provided his name.  When asked for his date of birth, Mr. Dillard responded, "8-0, 16, 2001.  Oh, sorry, 0-8, 16, 2001.  August 16, 2001."  Officer Barnes then asked Mr. Dillard for his social security number, which Mr. Dillard provided without issue.  Officer Barnes confirmed Mr. Dillard's information and then said, "So no guns in the car or anything like that?"  Mr. Dillard responded, "No."  Officer Barnes then asked Mr. Dillard where

Mr. Dillard and C.W. stayed, and Mr. Dillard responded.  Both Officer Barnes and Mr. Dillard were calm and polite.  Officer Barnes testified that Mr. Dillard was hunched over in his seat and appeared to be nervous during this initial interaction.

Officer Barnes left the driver side window at 9:31:56 p.m.  He walked around the back of the Ford, grabbed a notepad containing information about C.W. from Officer Gibson, and returned to the police cruiser.  Officer Gibson remained by the Ford, on the passenger side.  Officer Barnes sat down in his police cruiser and shut the door at 9:32:14 p.m.

Officer Barnes ran Mr. Dillard's name through at least one law enforcement database. Officer Barnes's database query returned a response that Mr. Dillard had multiple weapons-related arrests within the previous two years.  Specifically, Officer Barnes discovered that Mr. Dillard had recent arrests for misdemeanor carrying a loaded firearm in a public area and for felony robbery with a firearm.

Officer Barnes exited the cruiser and began re-approaching the Ford at 9:34:01 p.m. Officer Barnes stopped by the passenger side and told Officer Gibson, "He's probably got a gun." Officer Gibson responded, "You think so?"  Officer Barnes responded in the affirmative.  Officer Gibson said, "Wanna get him out?"  Officer Barnes said, "Yeah."

Officer Barnes then walked around the back of the Ford and returned to the driver side window.  At 9:34:25 p.m., Officer Barnes asked Mr. Dillard:  "Hey, Mr. Dillard, will you just hop out real quick?  We're just gonna step to the back of the car, everything's good."  Mr. Dillard said: "What's happening?"  Officer Barnes said:  "Just . . . I just want you to get out, and we'll talk." Mr. Dillard began opening his door, and Officer Barnes said, "We're good, just step out," helping the car door open fully after Mr. Dillard opened it.

As Mr. Dillard exited the Ford and stood up, Mr. Dillard asked, "What's going on, sir?" Officer Barnes asked, "Is there any weapons?"  Mr. Dillard said, "No, sir."  Officer Barnes asked, "Do you mind if I pat you down?"  Mr. Dillard responded, "Yes, sir."  Officer Barnes immediately followed up his "Do you mind if I pat you down?" question with, "Is that okay?"  Mr. Dillard looked Officer Barnes in the eyes and gave a quick, singular nod.

Officer Barnes testified that, from this interaction, he subjectively believed that he had Mr. Dillard's consent to pat him down.  According to Officer Barnes, he asked Mr. Dillard "Is that okay?" to confirm that he had consent to pat Mr. Dillard down.

Mr. Dillard testified that he subjectively misunderstood the tail end of this exchange, and he subjectively did not believe that he was providing consent to Officer Barnes.  Mr. Dillard testified that he understood his "Yes, sir," response to Officer Barnes's "Do you mind if I pat you down?" question as a negative response to that question—as in, "Yes, sir[, I mind]."  And after correctly hearing Officer Barnes ask, "Do you mind if I pat you down?", Mr. Dillard testified that he incorrectly thought that Officer Barnes followed up not with "Is that okay?", but with "Are you sure?"  So, according to Mr. Dillard's testimony, he understood his affirmative nod in response to that follow up as, "Yes[, I am sure that I mind]."

At 9:34:40 p.m., after Officer Barnes asked, "Is that okay?", and Mr. Dillard nodded, Officer Barnes told Mr. Dillard to turn around, saying, "Just face away from me."  Mr. Dillard turned.  Officer Barnes testified that Mr. Dillard spun around on his own.  Mr. Dillard testified that Officer Barnes had his left hand on Mr. Dillard to guide Mr. Dillard on which way he was to turn.  Officer Barnes testified that, after Mr. Dillard turned, Mr. Dillard voluntarily spread his feet apart.  However, Mr. Dillard testified that Officer Barnes put his leg between Mr. Dillard's legs and kicked both legs, signaling to Mr. Dillard to stand with his feet shoulder width apart.  Officer

Barnes began patting Mr. Dillard down.  Officer Barnes moved Mr. Dillard's right hand higher up on the car to pat down under his arm.  Officer Barnes patted down Mr. Dillard's sides, and he testified that he immediately felt a hard, L-shaped object on Mr. Dillard's left side, which Officer Barnes instantly believed to be a gun.  At 9:34:53 p.m., Officer Barnes said, "Just be cool, be cool. You're just detained."  Officer Barnes handcuffed Mr. Dillard at 9:34:58 p.m.  Officer Barnes testified that he did so for safety reasons, after feeling the gun.

After Officer Barnes placed Mr. Dillard in handcuffs, Officer Gibson came around the car and joined Officer Barnes with Mr. Dillard.  Officer Barnes placed his hand on Mr. Dillard's right arm.  The pat-down continued.  At this point, both Officer Barnes and Gibson were patting Mr. Dillard down, but Officer Barnes was the one primarily doing the pat-down.  At 9:35:06 p.m., Officer Barnes asked, "Is it loaded?"  Mr. Dillard responded, asking, "Sir?"  Officer Barnes repeated, "Is it loaded?"  Mr. Dillard responded, "What?"  At 9:35:14 p.m., Officer Barnes asked, "Do you have a gun?" Mr. Dillard again said, "No."  Still patting Mr. Dillard down, Officer Barnes asked, "What is it?", Mr. Dillard gave some unintelligible response, and Officer Barnes said, "This is?"  Officer Barnes again asked, "Is it loaded?"  Officer Barnes then said, "Stop moving, don't move," and Mr. Dillard said, "I'm not moving."  At 9:35:41 p.m., Officer Barnes asked, "Is it loaded?  Be straight with me."  Mr. Dillard said, "Yes."  Officer Barnes responded, "Okay," and, at 9:35:50 p.m., unzipped Mr. Dillard's jacket, reached in the left side, and removed a loaded Glock 33.  Officer Barnes asked, "Is it just the one on you?"  Mr. Dillard gave an affirmative "Mhmm." Officer Barnes asked, "Is there any more in the car?"  Mr. Dillard responded, "No, sir."

Both the body-worn camera footage and the oral testimony from Officer Barnes and Mr. Dillard show that, from the point when Officer Barnes told Mr. Dillard to turn around and began patting Mr. Dillard down to when Officer Barnes recovered the gun, Mr. Dillard did not question

Officer Barnes as to why he was patting him down.  Mr. Dillard never verbally protested the pat-down.  In contrast, C.W. can be heard in the body-worn camera recording loudly protesting Mr. Dillard's removal from the vehicle, the pat-down, and Mr. Dillard's subsequent handcuffing.  Right when the pat-down began, she asked, "Wait.  Why is he getting checked?"  Shortly after Mr. Dillard was handcuffed, she twice exclaimed, "This is illegal!"  Neither officer raised their voice in response to C.W. at any point.

Mr. Dillard testified that, during the pat-down, he was scared and nervous.  Mr. Dillard stated that he was scared that Officer Barnes might "take things into his own hands" if Mr. Dillard attempted to resist.  Mr. Dillard testified that he felt nervous because he was a Black man interacting with a White police officer at night.  Mr. Dillard was aware of bad stories about traffic stops with White police officers and Black drivers.  Mr. Dillard testified that he had not had any prior interactions with Officer Barnes before this traffic stop.  Mr. Dillard did not have any specific knowledge that Officer Barnes was racist, and he testified that Officer Barnes did not threaten violence towards him.

From the time that the officers pulled the Ford over until the time that Mr. Dillard was handcuffed, Mr. Dillard dealt only with Officer Barnes, as Officer Gibson remained on the passenger side of the Ford.  Throughout the interaction with Mr. Dillard, Officer Barnes never brandished any weapon, though he was visibly armed with a firearm, a baton, and a taser.  He never threatened Mr. Dillard with force, and he never raised his voice above a conversational level.  Both Officer Barnes and Mr. Dillard kept a conversational, polite tone during the entirety of the interaction.

After the officers received confirmation that Mr. Dillard had a felony conviction, they formally placed Mr. Dillard under arrest.  Mr. Dillard was never issued a traffic citation.  Officer

Barnes testified that he did not issue a citation because he believed doing so would have been petty and would have merely added insult to injury for Mr. Dillard.[1]

### III.  POSITIONS OF THE PARTIES

Mr. Dillard contends that the search (the pat-down) of his person violated the Fourth Amendment because Officer Barnes did not have a constitutionally reasonable basis for the search. Specifically, Mr. Dillard argues both that (1) he did not consent to the search, *see* Mot. 6–9, ECF No. 20; Reply 1–2, ECF No. 24, and (2) Officer Barnes did not have reasonable suspicion to constitutionally conduct the search pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), *see* Reply 2–5. Originally, Mr. Dillard also argued that Officer Barnes unreasonably extended the length of the traffic stop, at which point it became an unconstitutional seizure.  *See* Mot. 2–6.  However, the Court deems this argument waived because Mr. Dillard did not address this issue again in his Reply, *see generally* Reply, and he did not raise it at oral argument.  Lastly, at the hearing on the Motion, Mr. Dillard argued for the first time that the traffic stop itself was unconstitutional, for lack of probable cause.  But because this was the first time this position was aired, the Court does not consider it to be properly raised.[2]  So, the only position Mr. Dillard has taken which the Court must address is his position that the firearm recovered from his person should be suppressed

---

[1] The Court also heard testimony from C.W. and Officer Barnes.  Because their testimony is not ultimately germane to the dispositive issues analyzed *infra*, the Court does not include the details of their testimony in the above summary.

[2] Even if it were properly before the Court, the argument would be rejected.  Based on the evidence adduced at the hearing, the Court would find that the Officer Barnes had probable cause to believe that the Ford had no front plate displayed, which is a traffic violation in Virginia.  *See* Virginia Code § 46.2-715 ("License plates assigned to a motor vehicle . . . shall be attached to the front and the rear of the vehicle.").  Defense counsel conceded that Mr. Dillard could be pulled over under Virginia law for having no front plate displayed.  So, if the Court were required to reach the issue, the Court would find that Officer Barnes could constitutionally pull Mr. Dillard over at the outset.  *See Wren v. United States*, 517 U.S. 806, 809–10 (1996) ("An automobile stop" is "a 'seizure' of 'persons' within the meaning of" the Fourth Amendment and "is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances.  As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

because it was recovered pursuant to an unconstitutional search (an unconstitutional pat-down) of his person.

The Government takes the position that Officer Barnes's search (his pat-down) of Mr. Dillard was constitutional for two independent reasons, and so the weapon should not be suppressed.[3]  Primarily, the Government contends that the search was constitutional because Mr. Dillard provided consent.  *See* Resp. 13–22, ECF No. 22.  Alternatively, the Government argues that, even if the search was not consensual, the search was still constitutional under *Terry* because Officer Barnes had reasonable suspicion to believe that Mr. Dillard was armed and dangerous.  *See id.* at 22–25.  Finally, the Government argues that even if the Court were to find that the search *was* unconstitutional, the weapon still should not be suppressed under the exclusionary rule, because the remedy of exclusion is not appropriate in these circumstances.  *See id.* at 25–26.

## IV.  LEGAL ANALYSIS

Mr. Dillard challenges the search (the pat-down) of his person as lacking both consent and reasonable articulable suspicion to make it a permissible *Terry* frisk.  Either one of those grounds, on its own, can be a basis to render the warrantless search valid under the Fourth Amendment.  *See, e.g.*, *Fernandez v. California*, 571 U.S. 292, 298 (2014) (consent); *Terry v. Ohio*, 392 U.S. 1, 27 (1968) (*Terry* frisk).  Because, for the reasons that follow, the Court ultimately finds that the search was pursuant to consent, the Court need not reach the question of reasonable articulable suspicion, nor the Government's backstop argument regarding the exclusionary rule.

The Fourth Amendment provides that the "right of the people to be secure in their persons,

---

[3] The Government also forwarded one additional argument that was not responsive to the Defendant's Motion.  Specifically, the Government proactively argued that the seizure of the gun from Mr. Dillard's pocket was constitutional "under the 'plain feel' doctrine."  Resp. 15, ECF No. 22 (citing *United States v. Hernandez-Mendez*, 626 F.3d 203, 213 (4th Cir. 2010)).  But because Mr. Dillard does not challenge the seizure of the gun on its own— he only argues that there is no constitutional basis for the pat-down itself, as a search—the Court need not need address this issue.

houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *Florida*

*v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967)).

Before an officer "places a hand on the person of a citizen in search of anything, he must have

constitutionally adequate, reasonable grounds for doing so." *Sibron v. New York*, 392 U.S. 40, 64

(1968). As a general matter, "[a]n action is 'reasonable' under the Fourth Amendment, regardless

of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify

[the] action.'" *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (second alteration in original)

(emphasis omitted) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)).

The "basic rule" is "that 'searches conducted outside the judicial process, without prior

approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject

only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S.

332, 338 (2009) (quoting *Katz*, 389 U.S. at 357). "It is . . . well settled that one of the specifically

established exceptions to the requirements of both a warrant and probable cause is a search that is

conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Searches

pursuant to valid consent are consistent with the Fourth Amendment "because it is no doubt

reasonable for the police to conduct a search once they have been permitted to do so." *Jimeno*,

500 U.S. at 250–51 (citing *Schneckloth*, 412 U.S. at 219). Whether there was valid consent that

makes a warrantless search constitutionally reasonable "is to be determined by the totality of all

of the circumstances and is a matter which the Government has the burden of proving." *United*

*States v. Mendenhall*, 446 U.S. 544, 557 (1980) (citation omitted).

The applicability of the consent exception to the warrant requirement can be broken into

three prongs. There must be "voluntary consent," which raises the first two "related, but

10

analytically distinct, issue[s]"—(1) whether there are sufficient facts to support the presence of consent, i.e., "*factual* consent to the search," and (2) whether the "consent to the search was . . . 'voluntary,' *as a matter of law*." *United States v. Carter*, 300 F.3d 415, 423 (4th Cir. 2002).  If there was voluntary consent, then (3) the "issue becomes the scope of the authorization given to the officers" and whether the officers acted within the scope of that authorization.  *United States v. Coleman*, 588 F.3d 816, 819 (4th Cir. 2009).  Boiled down, the consent exception to the warrant requirement hinges on (1) factual consent, (2) voluntariness, and (3) scope.  In this case, only the first two of these three prongs are contested.[4]

Weighing the testimony at the motions hearing, reviewing the body worn camera footage of the incident, and looking at the totality of the circumstances, the Court finds that the pat-down was consensual and thus reasonable for Fourth Amendment purposes.  As such, the pat-down did not violate Mr. Dillard's Fourth Amendment rights, and so the Court will not suppress the firearm.

## A. Factual Consent

"Consent may be inferred from actions as well as words."  *United States v. Hylton*, 349 F.3d 781, 786 (4th Cir. 2003) (collecting cases).  "'[M]agic words' (such as 'yes') are not necessary to evince consent because 'the key inquiry focuses on what the typical reasonable person would have understood by the exchange between the officer and the suspect.'"  *United States v. Bynum*, 125 F. Supp. 2d 772, 783 (E.D. Va. 2000) (quoting *United States v. Stewart*, 93 F.3d 189, 192 (5th Cir. 1996)), *rev'd in part on other grounds*, 293 F.3d 192 (4th Cir. 2002).[5]  As the Fourth Circuit

---

[4] Mr. Dillard argues only that there was no voluntary consent to the pat-down; he has made no alternative argument—either in briefing or at oral argument—that, if there was voluntary consent, the pat-down exceeded the scope of his consent.  *See generally* Mot., ECF No. 20.  The Court therefore deems the third prong waived.

[5] The Fourth Circuit reversed Judge Payne's decision in *Bynum* to the extent that he suppressed certain physical evidence seized pursuant to a search warrant, finding that even if there was a lack of probable cause to support the search warrant, the good faith exception to the exclusionary rule applied.  *See Bynum*, 293 F.3d at 195–99.  The issue of the allegedly consensual search was not at issue on appeal.  So, the Fourth Circuit's ruling in no way disturbed

has recognized, "the Fourth Amendment does not even require that the suspect *actually* consent to a government search; factual determinations by the government, such as the presence of consent, must be *reasonable*, but are not required always to be correct." *United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990)); *accord United States v. Castellanos*, 518 F.3d 965, 969–70 (8th Cir. 2008) ("[T]he precise question is not whether [the defendant] consented, but whether his conduct would have caused a reasonable person to believe that he consented." (quoting *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001))). So, the question on this prong is "whether, based on the totality of the circumstances," the defendant's words or conduct "would have caused a reasonable person to believe that he consented." *United States v. Harvey*, 901 F. Supp. 2d 681, 692 (N.D.W. Va. 2012) (quoting *Castellanos*, 518 F.3d at 969–70). "[I]n examining the totality of the circumstances to determine whether a reasonable officer would interpret a gesture or conduct as consent, it is necessary to consider the question posed by, and the actions of, the law enforcement officers to which the defendant's non-verbal conduct was a response." *Bynum*, 125 F. Supp. 2d at 783–84. Relatedly, "[i]n cases where a defendant's response to a request for permission to search is ambiguous, courts have generally relied upon the defendant's failure to protest the search in finding consent." *United States v. Dubon*, 2023 WL 4109625, at *6 (E.D. Va. June 21, 2023) (alteration in original) (quoting *United States v. Barrington*, 210 F. Supp. 2d 773, 778 (E.D. Va. 2002)).

In this case, the dispute over the factual basis for a consent finding hinges on what happened right after Officer Barnes had Mr. Dillard get out of the car. Officer Barnes asked Mr. Dillard, "Do you mind if I pat you down?", to which Mr. Dillard responded, "Yes, sir." Officer

---

Judge Payne's persuasive explanation in *Bynum* regarding the standards governing the consent exception to the warrant requirement.

Barnes immediately followed up with "Is that okay?", to which Mr. Dillard responded with a seemingly affirmative nod of the head.  After Officer Barnes began patting Mr. Dillard down, Mr. Dillard did not protest the pat-down.

The Government argues that, in context, this interaction conveyed consent.  The Government contends that Mr. Dillard's "Yes, sir," response to "Do you mind if I pat you down?" "conveyed consent by itself" because "the officer was asking for consent and [Mr.] Dillard said *yes*."  Gov't's Resp. 14.  The Government also says that Mr. Dillard's affirmative nod in response to Officer Barnes's clarifying "Is that okay?" question constituted consent to the pat-down, because "the *that* to which the question referred was . . . the pat[-]down." *Id.*  The Government also stresses that Mr. "Dillard never protested the pat[-]down," "never pulled away," and "never said 'no' or verbalized that he had changed his mind." *Id.* at 15.

Mr. Dillard argues that by responding "Yes, sir," to "Do you mind if I pat you down?", he conveyed a "negative response," as in:  "Yes, sir[, I mind if you pat me down]."  Mot. 7.  Mr. Dillard also testified that he did not hear Officer Barnes follow up with "Is that okay?", but instead heard him say "Are you sure?"  So, when Mr. Dillard nodded his head, he testified that he was nodding "Yes," meaning to convey, "Yes[, he was sure that he minded if Officer Barnes patted him down]."  Mr. Dillard also alternatively argued in his Reply that Officer Barnes's "Is that okay?" follow-up "is ambiguous in the overall context."  Reply 1, ECF No. 24.

Looking at the totality of the circumstances in this particular case, the Court holds that a reasonable person in Officer Barnes's position[6] would have interpreted Mr. Dillard's conduct as consenting to the pat-down.

---

[6] For the remainder of this Opinion, the Court uses "reasonable officer" as shorthand for "reasonable person in Officer Barnes's position."

At the outset, the Court rejects the Government's contention that Mr. Dillard's "Yes, sir" response to Officer Barnes's "Do you mind if I pat you down?" question conveys consent by itself. On its own, the Court finds Officer Barnes's "Do you mind if I pat you down?" question to Mr. Dillard to be of very little utility in determining whether there is a factual basis to support (or undermine) a finding of consent here.  Mr. Dillard is correct that, looking at that question and his "Yes, sir" response literally, his response was a negative one, as in "Yes, sir[, I mind]."  But in cases where an officer asks a "Do you mind if . . . ?" question and the defendant responds with a short affirmative answer that literally conveys a denial of consent, courts (including this one) have gone on to contextualize that response and adjudge consent based on what happened after the "Do you mind if . . . ?" exchange, with varying, context-specific results.  *Compare Barrington*, 210 F. Supp. 2d at 778–79 (finding no consent where the officer asked the defendant "Do you mind if I take a look?" and the defendant responded "Sure," based on the defendant's "repeate[d]" and "continued protest of the search" that followed, explaining that "this equivocal statement may not be divorced from the underlying circumstances" and that the continued protest "would have alerted a reasonable officer that there was no consent"), *with United States v. Price*, 54 F.3d 342, 345–46 (7th Cir. 1995) (affirming finding of consent where the officer asked the defendant "Do you mind if I take a look?" and the defendant responded "Sure," based on the fact that the defendant's response was "ambiguous and thus capable of being interpreted as either 'Go ahead' or 'No way'" and on the "crucial fact" that the defendant "fail[ed] to protest upon learning that [the officer] understood his response as a consent to the search"), *and Gale v. O'Donohue*, 2019 WL 1897130, at *8 (E.D. Mich. Apr. 29, 2019) (finding consent where officer asked "Any ID on you?  Do you mind if I – do you mind if we check?" and the defendant responded "Absolutely," finding a "literal interpretation . . . not necessarily consistent with the fundamental inquiry of the Fourth

14

Amendment—objective reasonableness," that "a reasonable person in [the officer's] position would have understood [the defendant] to be communicating his consent to the removal of his wallet," and stressing that the defendant "did not protest when [the officer] removed his wallet to check his ID"), *aff'd*, 824 F. App'x 304 (6th Cir. 2020), *and United States v. Tomlinson*, 190 F. Supp. 3d 834, 840–41 (S.D. Ind. 2016) (finding consent where the officer asked "Do you mind if I search your pockets?" and the defendant responded "Yes," based on "the crucial fact" of the defendant's "failure to protest upon learning that [the officer] understood his response as a consent to the search" and "began searching his pockets"). Even in a case where a defendant tersely responded in the negative to a "Do you mind . . . ?" question, and so literally conveyed consent to a search, the reviewing court considered what followed in determining how to construe that response; based on that context, the court found no consent. *See United States v. Jarvis*, 2021 WL 4840809, at *2 (N.D. Ohio Oct. 18, 2021) (finding no consent where the officer asked the defendant if he "minded" if the officer searched him and the defendant responded "No," finding "confusion and discrepancy" in the response, and emphasizing that the defendant "became 'loud' and 'agitated'" as the officer reached into his pocket, "protestation" which "confirm[ed] that [the defendant's] response of 'no' did not constitute consent to search"). To answer the instant question, then, the Court will turn to what came after Officer Barnes's "Do you mind . . . ?" question.

In looking at what followed, the Court finds that a reasonable officer would think that Mr. Dillard consented to a pat-down. Right after Officer Barnes asked Mr. Dillard "Do you mind if I pat you down?", Officer Barnes immediately followed up with, "Is that okay?" Based on Officer Barnes's testimony, the "that" to which Officer Barnes was referring was patting Mr. Dillard down. Essentially, the question was, "Is [me patting you down] okay?" Mr. Dillard nodded his head, a

gesture indicating "Yes."  A reasonable officer would have believed that Mr. Dillard was, as a matter of fact, consenting to a pat-down.

Even if the Court were to accept as true—despite the clarity of the questions as recorded by Officer Barnes's body-worn camera—Mr. Dillard's testimony that he *subjectively* misunderstood Officer Barnes's follow-up as "Are you sure?" instead of "Is that okay?" and *subjectively* believed that he was not consenting, such credence does not alter the result on this prong, because that does not alter how a reasonable officer would have understood Mr. Dillard's response.  *See Smith*, 395 F.3d at 519 ("[F]actual determinations by the government, such as the presence of consent, must be *reasonable*, but are not required always to be correct."); *accord Castellanos*, 518 F.3d at 969–70 ("[T]he precise question is . . . whether [the defendant's] conduct would have caused *a reasonable person to believe* that he consented." (emphasis added) (quoting *Jones*, 254 F.3d at 695)).  The Court has been made aware of nothing in the record to suggest that a reasonable officer should have had any reason to think that Mr. Dillard had not heard Officer Barnes's follow-up question correctly.  Mr. Dillard made no argument that he misheard anything else that Officer Barnes had said before Officer Barnes asked, "Is that okay?", let alone an argument that he gave any indication that a reasonable officer should have thought that Mr. Dillard was unable to understand this (or any) question.  Based on the body camera footage, Mr. Dillard had responded appropriately to the questions that Officer Barnes asked up to this point.  As the Court assesses the totality of the circumstances, the Court is convinced that a reasonable officer would have understood Mr. Dillard's nod to "Is that okay?" as consent to a pat-down.

Also, on these facts, the Court sees Mr. Dillard's failure to protest the pat-down after it began as an additional indicator that a reasonable officer would have understood Mr. Dillard to be

consenting.[7]  Only fifteen seconds elapsed from when Officer Barnes told Mr. Dillard to turn around to when Officer Barnes placed Mr. Dillard in handcuffs, but during that time, Mr. Dillard did not object to what was happening.  Mr. Dillard did not ask Officer Barnes why he was patting him down.  Mr. Dillard did not become agitated or disgruntled.  Mr. Dillard did not voice confusion as to why, in Mr. Dillard's apparent perspective, Officer Barnes was overriding Mr. Dillard's expressed position that he *did* mind the pat-down.  Mr. Dillard did not object at all to the pat-down after he was placed in handcuffs, either.  A reasonable officer would have understood Mr. Dillard's lack of any objection to the pat-down to mean that the officer had accurately understood Mr. Dillard's nod to have been consent to a pat-down.

Looking at the totality of the circumstances in this particular case, the Court finds that a reasonable officer would have understood Mr. Dillard to be consenting to a pat-down.

## B. Voluntariness

Having found that the facts support a preliminary finding of consent, the question becomes one of voluntariness.  "In determining whether consent to search was freely and voluntarily given, the totality of the circumstances surrounding the consent must be examined."  *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (en banc) (citing *Schneckloth*, 412 U.S. at 217).  The Government cannot meet its "burden of proving that the consent was . . . freely and voluntarily given . . . by showing no more than acquiescence to a claim of lawful authority."  *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968).  There is a "difference between voluntary consent to a request versus begrudging submission to a command."  *United States v. Robertson*, 736 F.3d 677, 680 (4th Cir. 2013).

---

[7] At oral argument, counsel for Mr. Dillard argued that Mr. Dillard was scared and that he did not feel like he was able to object in these circumstances, and so the Court should not glean anything from his failure to object. That is more so an argument about the "voluntariness" of Mr. Dillard's consent, a distinct question considered *infra*.

"In viewing the totality of the circumstances," a court is to "consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *Lattimore*, 87 F.3d at 650. "Whether the accused knew that he possessed a right to refuse consent also is relevant in determining the voluntariness of consent, although the Government need not demonstrate that the defendant knew of his right to refuse consent to prove that the consent was voluntary." *Id.*

The Government argues that the consent was voluntary. The Government notes that there were only two officers on the scene at the time of the pat-down, and the entire encounter had lasted only around four minutes up to that point. Resp. 21. The Government also stresses that Officers Barnes and Gibson never "bark[ed] any order at [Mr. Dillard] or [C.W.]"; they "were calm and deliberate in their words and actions throughout the investigation, and they maintained conversational tones of voice"; they "never threatened force or used physical force to dominate or coerce [Mr.] Dillard"; and "[n]either of the officers drew their guns or even touched their service weapons during the encounter." *Id.* The Government also points to the fact that Officer Gibson only moved to join Officer Barnes on the driver's side when Officer Barnes felt the gun and handcuffed Mr. Dillard, so up through the time Mr. Dillard gave his consent, "Officer Barnes and [Mr.] Dillard had been interacting one-on-one." *Id.*

Mr. Dillard argues that any consent he ostensibly gave to this pat-down was not voluntary. He argues that he is a "Black male" who was confronted by "two White police officers, in uniform, wearing ballistic vests, and armed," and, as more crystallized at the motions hearing, that he was scared about what might happen in this traffic stop, given the bad stories that he had heard about police interactions between Black men and White officers. *See, e.g.*, Mot. 6–7. Mr. Dillard also

18

argues that Officer Barnes "ignored Mr. Dillard's questions, directed Mr. Dillard out of the vehicle despite his hesitancy, and then physically controlled Mr. Dillard." *Id.* at 7.  Mr. Dillard also points to the facts that this incident took place at night and that Officer Barnes did not explain to him that he had a right to refuse to consent to the pat-down.  *E.g.*, *id.* at 8.  Mr. Dillard argues that, taken all together, this was a coercive environment and that any consent could not be legally "voluntary."

Having reviewed the body camera video and weighed the testimony at the motions hearing, the Court finds that Mr. Dillard's consent was voluntary as a matter of law.  From the time when Officer Barnes initiated the traffic stop through when he asked Mr. Dillard "Do you mind if I pat you down?  . . . Is that okay?", he was interacting with Mr. Dillard one-on-one, his tone was conversational and polite, and both men were displaying a calm affect, conversing back and forth. *See Robertson*, 736 F.3d at 681 (interactions "characterized by relaxed, friendly conversation between the two sides" are indicative of voluntariness).  It was a short period of time from when Mr. Dillard was pulled over until when he was asked for his consent to be patted down and nodded his head in what was seemingly a "Yes."  *See Lattimore*, 87 F.3d at 651 (fact that incident "was not of inordinate duration" supports finding of voluntariness).  Officer Barnes's request to have Mr. Dillard exit the vehicle ("Mr. Dillard, will you just hop out real quick?") and his subsequent explanation for the directive ("I just want you to get out, and we'll talk."), were expressed in a calm and respectful tone.  Though, as Mr. Dillard notes, this interaction took place at night, and he questioned why he was being asked out of the car ("What's going on, sir?"), the Court does not find that Mr. Dillard's consent was involuntary when considered along with everything else.  The operative request to pat Mr. Dillard down was made calmly and politely, "made without threats, force, or physical intimidation." *United States v. Wilson*, 895 F.2d 168, 170 (4th Cir. 1990) (per curiam) (finding voluntary consent).  And this is not a case where Officer Barnes repeatedly asked

for consent until Mr. Dillard finally agreed; Officer Barnes asked his follow-up right after his first (unclear) question, and Mr. Dillard nodded immediately.  "[A]t no time" did Officer Barnes "use force or a threat of force to coerce [Mr. Dillard's] consent" to the pat-down.  *Lattimore*, 87 F.3d at 651 (finding voluntary consent).  While there was physical contact between Officer Barnes and Mr. Dillard,[8] such contact and any putative "force" inherent in it occurred after Mr. Dillard had factually consented to the pat-down with his nod.

Also, there were two police officers and two passengers present at the traffic stop.  When he gave consent, Mr. Dillard was the only passenger out of the Ford, but, as discussed, he was dealing with Officer Barnes one-on-one.  Nothing suggests that this was the sort of "police-dominated atmosphere" that is so inherently coercive and intimidating that Mr. Dillard's factual consent was involuntary as a matter of law.  *See Robertson*, 736 F.3d at 680 (five uniformed officers and three patrol cars at the scene was a factor in finding involuntariness); *cf. United States v. Elie*, 111 F.3d 1135, 1145–46 (4th Cir. 1997) (finding voluntariness where at least six officers were present), *abrogated in part on other grounds by Dickerson v. United States*, 530 U.S. 428 (2000).

Moreover, Mr. Dillard's characteristics, assessed among the totality of the circumstances in this particular case, do not command a finding of involuntariness.  On the date of the search, Mr. Dillard was 22 years old and was a high school graduate, and he demonstrated that he understood what was happening during the interaction.  Though Officer Barnes did not inform Mr. Dillard of his right to refuse consent, that is not a constitutional prerequisite to a finding of voluntariness.  *See, e.g.*, *Lattimore*, 87 F.3d at 650.  Responsive to Mr. Dillard's arguments and

---

[8] Giving utmost credit to Mr. Dillard's testimony, the extent of such contact amounts to Officer Barnes: (1) guiding Mr. Dillard in turning towards the vehicle; (2) moving Mr. Dillard's hand to an elevated position on the roof of the vehicle; (3) widening Mr. Dillard's stance; and (4) placing Mr. Dillard in handcuffs.

testimony, the Court notes Mr. Dillard's race[9] and acknowledges Mr. Dillard's testimony that, as a Black man, he was nervous and scared to refuse consent because he was cognizant of the racial implications of a Black man being stopped by a White police officer, and he was aware of the far too many well-documented stories of Black people being harmed by White police officers. There was no evidence adduced that Officer Barnes was subjectively aware of Mr. Dillard's racial-tension-related nervousness when he sought consent to search Mr. Dillard. Nevertheless, the Court assumes that a reasonable officer in this situation would be aware of the racial element of this traffic stop, in terms of its enhancement of the typical—i.e., non-race-related—power imbalance inherent in any traffic stop. As the Court factors this characteristic of Mr. Dillard's in with the totality of the circumstances, however, the Court remains convinced that Mr. Dillard's factual consent was legally voluntary. As stated, Officer Barnes's tone was polite throughout, he never threatened any force or brandished any weapon, only four minutes passed from inception of the traffic stop to when Mr. Dillard was asked and ordered out of the car, and Officer Barnes asked just two calm questions back-to-back to get consent. And notably, C.W., who is also Black, loudly questioned the legality of the stop and the interaction between Officer Barnes and Mr. Dillard multiple times, and neither Officer Barnes nor Officer Gibson ever so much as raised their voice when responding to C.W. In other words, the situation and dynamic between Mr. Dillard, C.W., and the White officers was not so inherently coercive that she, equally subject to the power dynamics at play, felt unable to voice objections and concerns. Based on the circumstances of this

---

[9] "[S]ince [*United States v.*] *Mendenhall*, [446 U.S. 544 (1980),] the Supreme Court has ignored race in its consent search cases, and lower courts have followed suit." 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.2 n.10 (6th ed. 2024 update) (quoting Beau C. Tremitiere, Note, *The Fallacy of A Colorblind Consent Search Doctrine*, 112 Nw. U. L. Rev. 527, 528 (2017)); *see also* 2 Wayne R. LaFave et al., *Criminal Procedure* § 3.10(b) (4th ed. 2023 update) (describing factors bearing on validity of consent and not mentioning race). Despite this landscape, because the Court is tasked to look at consider the "totality of the circumstances," to include "the characteristics of the accused," *Lattimore*, 87 F.3d at 650, and Mr. Dillard has explicitly raised a race-based argument regarding voluntariness, *see* Mot. 6, the Court explicitly weighs this factor as well.

21

particular case, considering Mr. Dillard's characteristics along with everything else, the Court remains persuaded that this pat-down was conducted pursuant to voluntary consent.

All in all, this does not look like the sorts of cases deemed to be "begrudging submission[s] to a command," *Robertson*, 736 F.3d at 680, or "no more than acquiescence to a claim of lawful authority," *Bumper*, 391 U.S. at 548–49. Officer Barnes did not begin this interaction with "immediately accusatory" questioning: he politely greeted Mr. Dillard and C.W., introduced himself, gave them an explanation for the stop, asked them for ID, and only then asked if there were any weapons in the car (adding, "Not illegal, we just need to know whether you got a gun."). *See Robertson*, 736 F.3d at 680 (finding that the officer's "immediately accusatory" "first question [of] whether [the defendant] had anything illegal on him" cut in favor of involuntariness). Officer Barnes kept a conversational tone, he never threatened force, and he asked Mr. Dillard for his consent to a pat-down. Officer Barnes never made any claim of lawful authority to pat Mr. Dillard down or threatened repercussions if Mr. Dillard did not consent. These facts stand in stark contrast to the facts in cases where consent was found to be involuntary. *See, e.g.*, *Bumper*, 391 U.S. at 548–49 (finding involuntariness where officers falsely claimed they had a warrant); *Gregg v. Ham*, 678 F.3d 333, 336–37, 342 (4th Cir. 2012) (finding involuntariness where a physically disabled woman allowed an officer, who was armed with a shotgun, and three bail bondsmen into her home after the officer shook the door and said that she "had to let them come in or he was going to come in"); *cf. United States v. Azua-Rinconada*, 914 F.3d 319, 323 (4th Cir. 2019) (finding voluntariness where homeowner allowed officers in even where officer threatened that the officers would knock down the door).

Looking at the totality of the circumstances under which Mr. Dillard consented to a pat-down of his person, the Court finds that Mr. Dillard's consent was voluntary as a matter of law.

## V.  CONCLUSION

For the reasons stated above, Officer Barnes's pat-down of Mr. Dillard was reasonable under the Fourth Amendment because it occurred after Officer Barnes obtained Mr. Dillard's voluntary consent.  The pat-down thus did not violate Mr. Dillard's Fourth Amendment rights, and so the Court will not suppress the firearm.

An appropriate Order denying the Motion to Suppress and memorializing the Court's ruling from the bench at the June 24, 2024 motions hearing shall issue.

                                            /s/ _____

Roderick C. Young
United States District Judge

Date: <u>July 17, 2024</u>
Richmond, Virginia

23